IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 5, 2018

# IN RE ARIANNA Y., ET AL.[1]

**Appeal from the Juvenile Court for Knox County**
**No. 149313   Timothy E. Irwin, Judge**

_____

## No. E2018-00170-COA-R3-PT

_____

The father of four minor children began serving a five year sentence on March 16, 2015. The minor children were living with their paternal grandmother and mother, and on December 29, 2016, were removed from the custody of their mother due to substance abuse. The children were adjudicated dependent and neglected and placed in the custody of DCS where they have been in the care of foster parents since that date.  DCS filed a petition for termination of parental rights as to father and the Juvenile Court of Knox County terminated his parental rights on the grounds of wanton disregard.  Father appeals.  Finding no error, we affirm the judgment.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KENNY W. ARMSTRONG, J., joined.

Michael J. Stanuszek, Knoxville, Tennessee, for the appellant, Dennis Y.

Herbert H. Slatery, III, Attorney General and Reporter; and W. Derek Green, Assistant Attorney General, for the Tennessee Department of Children's Services.

## OPINION

This appeal involves the termination of the parental rights of Dennis Y. ("Father"), the father of four children, Arianna Y. (born October 2007), Adrienne Y. (born March 2009), Alexandria Y. (born February 2012) and Annabella Y. (born December 2012).

---

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

On December 29, 2016, the Department of Children's Services ("DCS") initiated a proceeding in Knox County Juvenile Court to have the children adjudicated dependent and neglected due to their mother's "substance abuse issues" and the father's incarceration and for temporary legal custody. The petition noted that Father is currently incarcerated at Northwest Correctional Complex" and "has a lengthy criminal history"; a protective custody order was entered that day granting temporary custody to DCS. Following a preliminary hearing on December 30, the court entered an order finding probable cause that the children were dependent and neglected based on Father's incarceration and inability to provide care and supervision; the court continued custody with DCS and set an adjudicatory hearing for March 21, 2017. An order was entered on May 31, memorializing the proceeding and results of the hearing; pertinent to this appeal, the order recites:

> Upon stipulation of the parties, the Court finds by clear and convincing evidence that the children are dependent and neglected within the meaning of the law due to the mother's substance abuse issues and failure to provide for the appropriate care and supervision of the children, as alleged in the petition. The parties are aware that the agreement is based upon the order of the court and that failure to comply therewith without just cause places them in contempt of court and subjects them to such action as the court deems proper within its jurisdiction.
>
> As to the father, Dennis [Y.], the Court finds by clear and convincing evidence that the children are dependent and neglected within the meaning of the law due to the father's criminal history, incarceration, and failure to provide for the appropriate care and supervision of the children, as alleged in the petition.

The court adjudicated the children dependent and neglected, and continued custody with DCS.

DCS filed a petition to terminate Father's parental rights on the ground of engaging in conduct prior to his incarceration exhibiting a wanton disregard for the welfare of the children on July 18, 2017, alleging:

> 3. Prior to his current incarceration, Respondent already had a lengthy criminal history beginning in 1999. He had been convicted of 6 prior felonies and 17 misdemeanors. He had been revoked from probation 9 times. He had incurred 15 disciplinary infractions while incarcerated in the Department of Correction. As his evaluation for Enhanced Probation noted, "It does not appear that incarceration or community supervision have altered defendant's criminal behavior." Respondent's drug of choice was alcohol, which he used daily until he was arrested. He had used crack,

marijuana and opiates and admitted daily use of "pain pills" for about three years prior to his most recent arrest.

4. Respondent had been sentenced in May 2002 to 3 years imprisonment for burglary and theft. He was sentenced to 3 years imprisonment again in March 2004 for robbery. Arianna was born in October 2007, after Respondent completed those sentences. Adrienne was born in March 2009. During that time Respondent avoided any new charges. His good conduct did not last. In June 2010 he committed another theft and in January 2010 he was charged with burglary and attempted aggravated burglary. On March 26, 2010, he entered guilty pleas to those charges and received an effective sentence of 4 years imprisonment. His oldest daughter was not quite 31/2years old. Respondent was paroled in May 2011 and almost immediately committed a new shoplifting offense. Alexandria was born in February 2012. Respondent was caught shoplifting again in November of that year. Annabella was born in December 2012. Respondent has admitted drinking daily throughout his daughter's lives and using "pain pills" daily at least since his younger daughters were born.

Father responded to the petition, contesting the termination and requesting the appointment of legal counsel; as requested, the court appointed counsel for Father.

A hearing on the petition was held on December 19, 2017, at which two witnesses testified: Father, who testified telephonically, and Mr. Foster, the foster parent. On January 4, 2018, the court entered its order terminating Father's parental rights on the grounds of wanton disregard for the welfare of the children, finding:

1. These children were removed from their mother's custody due to her substance abuse and resulting inability to provide for the children's proper care and supervision. At the time of their removal, Respondent was already incarcerated. Called as the Department's first witness, Respondent admitted each factual allegation regarding his history. He was arrested on March 16, 2015, just after midnight after attempting to remove a cast iron wood chipper from the victim's pickup truck. The victim responded to the noise and was able to detain Respondent until law enforcement arrived. On July 16, 2015, he entered guilty pleas to burglary and criminal trespass and received an effective sentence of five (5) years imprisonment. [Knox County Criminal Court, Division I, Case No. 105233] He had already been in jail from March 16, 2015, to April 9, 2015 (when he submitted to the charges), and from June 6, 2015, until the date of sentencing. He was then transferred to the Department of Correction and remains in prison.

2. Prior to his current incarceration, Respondent already had a lengthy criminal history beginning in 1999. He had been convicted of 6 prior felonies and 17 misdemeanors. He had been revoked from probation 9

3

times. He had incurred 15 disciplinary infractions while incarcerated in the Department of Correction. He was rejected from Enhanced Probation as it did not appear that incarceration or community supervision had altered his criminal behavior. Respondent's drug of choice was alcohol, which he used daily until he was arrested. He had used crack, marijuana and opiates and admitted daily use of "pain pills" for about three years prior to his most recent arrest.

3. Respondent had been sentenced to in May 2002 to 3 years imprisonment for burglary and theft. He was sentenced to 3 years imprisonment again in March 2004 for robbery. Arianna was born in October 2007, after Respondent completed those sentences. Adrienne was born in March 2009. During that time Respondent avoided any new charges. His good conduct did not last. In June 2009 he committed another theft and in January 2010 he was charged with burglary and attempted aggravated burglary. On March 26, 2010, he entered guilty pleas to those charges and received an effective sentence of 4 years imprisonment. His oldest daughter was not quite 31/2 years old. Respondent was paroled in May 2011 and almost immediately committed a new shoplifting offense. Alexandria was born in February 2012. Respondent was caught shoplifting again in November of that year. Annabella was born in December 2012. Respondent drank daily throughout his daughter's lives and abused "pain pills" daily at least since his younger daughters were born.

4. In his letters from prison to the children's case manager, Respondent admitted "that a lot of what has happened with my children has been my fault. I have done a lot that I'm not proud of and I regret . . . They don't deserve to be put threw [sic] what they are going threw [sic] because I like to party. I use to believe in my mind that as long as I was worken[sic] and the kids was taken care of, then I could take any extra money and get drunk if I wanted too. I now know that that was selfish and irisponsible [sic]." He also wrote, "I'm very sorry for what I have put my children threw. I didn't relize [sic] what I then that what I was doing would lead to all that has happened. The pills and drinking had my mind not worken [sic]. I thought that as long as I worked and supported my family that it was okay to drink and party when I wasn't worken [sic]."

5. Respondent insists that he is now a changed man. During this imprisonment he has obtained his GED and participated in anger management treatment, parenting instruction, and AA meetings. He is now in a 90-day career management program. Substance abuse treatment and a mental health evaluation are "in the works", meaning that he has "put in for them" but has not yet begun. He anticipates release at the earliest in November or December 2018. He has a job waiting for him and can live with his boss. He insists that he loves his children, that they love him, and they have a great relationship.

6. Upon those facts, the Court finds that prior to his current incarceration, Respondent engaged in conduct which exhibits a wanton disregard for the welfare of the children. Respondent's own testimony establishes that he was not thinking about his children while he was engaging in repeated criminal conduct, getting thrown in jail, and drinking, partying and abusing pain pills when he was not working. That is a classic description of wanton disregard.

The court also found that termination of Father's rights was in the children's best interest:

1. The Court cannot tell at this point whether Respondent has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interest to be in his home. He won't have a home for at least another year. Whether his progress in prison will continue after his release has yet to be seen; his previous periods of incarceration did not result in any longstanding change. He is asking this Court to keep the children in limbo for another year while he is in prison and many months, at least, after that while he gets on his feet and re-establishes a relationship with them. Due to his own conduct, Respondent has not been able to maintain regular visitation or other contact with the children and whatever relationship may once have existed between Respondent and the children has been damaged by his absence and his conduct. When given the opportunity to speak with their father on the phone, the children declined. A change of caretakers and physical environment is likely to have a detrimental effect on the children's emotional and psychological condition. Respondent has shown neglect toward these children. He remains without a healthy and safe physical environment to offer the children. Prior to this incarceration, he engaged in criminal activity and in such use of alcohol or controlled substances as may render Respondent consistently unable to care for the children in a safe and stable manner.

2. The mother's parental rights have been terminated by prior order of this Court.

3. The Department of Children's Services has made reasonable efforts toward achieving permanency for these children.

4. The children are entitled to a safe, secure and loving home. They have been in the same foster home since their removal into foster care and are ready to be adopted. They are all in weekly individual therapy. They have each selected a new name. When they first came to this home, the oldest two fought constantly and wouldn't do any school work. Now the fighting and bickering have stopped. Arianna is on the honor roll in school and Alex received an academic award. Adrienne receives medication to treat ADHD and help her focus; this has been helping. The children have stabilized. They are happy and successful. Their mother's parental rights

5

have already been terminated and they need permanency. They deserve to grow up knowing where they will lay their heads at night.

Father appeals, stating the following issues:

1. Whether appellant had shown a wanton disregard toward the welfare of the children prior to his incarnation?

2. Whether it was in the best interest of the children to terminate appellant's parental rights?

## I. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Serv. v. C.H.K.,* 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). The statutes on termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

Because the decision to terminate parental rights affects fundamental constitutional rights and carries grave consequences, courts must apply a higher standard of proof when adjudicating termination cases. *Santosky*, 455 U.S. at 766–69. A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808–09; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, "as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements" necessary to terminate parental rights. *Id.* In this regard, clear and convincing evidence is "evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence" and which "produces a firm

belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established." *In re Alysia S.,* 460 S.W.3d 536, 572 (Tenn. Ct. App. 2014) (internal citations omitted).

## II. WANTON DISREGARD

A parent's rights may be terminated on the ground of abandonment. Tenn. Code Ann. § 36-1-113(g)(1). The statute defines abandonment, in relevant part, as follows:

> *A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child,* or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, [and] *the parent or guardian has engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child.*

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added).

This court has stated that Tennessee Code Annotated section 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be other problems in the home that threaten the welfare of the child." *In re Audrey S.,* 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Ultimately, "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* But the second test for abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(iv) does not make incarceration alone a ground for abandonment. Under the second part of the test, an incarcerated or recently incarcerated parent can be found guilty of abandonment "only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Accordingly, a parent's incarceration serves "as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

The pre-incarceration conduct referred to in Tenn. Code Ann. § 36-1-102(1)(A)(iv) is not limited to acts during the four-month period immediately preceding the incarceration. *In re Jeremiah T.,* No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (no Tenn. R. App. P.11 application filed) (citing *In re Audrey S.,* 182 S.W.3d at 871). It is well established that probation violations,

repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare. *In re Audrey S.* 182 S.W.3d at 868 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7-8 (Tenn. Ct. App. Jan. 11, 2005) (perm app. denied Tenn. Mar. 21, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at *7 (Tenn. Ct. App. Mar. 17, 2004) (no Tenn. R. App. P. 11 application filed); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474.75 (Tenn. Ct. App. 2000)).

Father admitted at trial that he has a lengthy criminal history and to alcohol and drug abuse during the three years prior to his arrest in 2015. Father was rejected for enhanced probation due to a lack of benefit from previous supervision. Before and after the birth of his children Father repeatedly committed felonies and misdemeanors, and used alcohol and drugs of his own volition and without regard for his children's welfare; this resulted in his incarceration and resulting inability to take care of the children when they were removed from their mother's custody and placed in foster care. The behavior also included disciplinary infractions and resulted in, among other things, his ineligibility for enhanced probation. The pattern of his conduct prior to incarceration clearly exhibited disregard for the consequences and for the effect that the conduct might have on the children and his relationship with them. The evidence is clear and convincing that Father has exhibited wanton disregard for the children within the meaning and intent of Tennessee Code Annotated section 36-1-102(1)(A)(iv).

## III. BEST INTEREST

Once a ground for termination has been proven by clear and convincing evidence, the trial court must then determine whether it is in the best interest of the child for the parent's rights to be terminated, again using the clear and convincing evidence standard. *In re Valentine*, 79 S.W.3d at 546. The legislature has set out a list of factors at Tennessee Code Annotated section 36-1-113(i) for the courts to follow in determining the child's best interest.[2] The list of factors in the statute "is not exhaustive, and the statute

---

[2] The factors at Tennessee Code Annotated section 36-1-113(i) are:

In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

does not require every factor to appear before a court can find that termination is in a child's best interest." *In re S.L.A.*, 223 S.W.3d 295, 301 (Tenn. Ct. App. 2006) (citing *Tenn. Dept. of Children's Svcs. v. T.S.W.*, No. M2001-01735-COA-R3-CV, 2002 WL 970434, at *3 (Tenn. Ct. App. May 10, 2002); *In re I.C.G.*, No. E2006-00746-COA-R3-PT, 2006 WL 3077510, at *4 (Tenn. Ct. App. Oct. 31, 2006)). As we consider this issue we are also mindful of the following instruction in *White v. Moody*:

> [A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

Father testified that while in prison he earned his GED, took parenting and anger management classes, substance abuse counseling, Career Management for Success, and will have a mental health evaluation. Additionally, Father stated "I'm doing any and everything to better myself so when I get out, I'll be better," and that he has accomplished, or is in the process of accomplishing, the requirements of the permanency plan. Father stated that he should be out of prison in November or December of 2018, that he will have a job, and that he will be able to secure housing.

---

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Mr. Foster, the foster parent, stated that the children have been living with him, his wife, and their adopted child since December 26, 2016, and that when they came into their home they fought, were disobedient, and that Arianna and Adrienne would not do their schoolwork. Within the first year of being in their care, the two children are doing well in school, the fighting has stopped, and they help take care of each other. One of the children has ADHD and is receiving treatment, and all of the children receive therapy once per week. Mr. Foster testified that the Children told the therapist that they do not want to talk to their father and that the therapist has talked to the Children about the adoption process. Mr. Foster also stated that the children have chosen new names for their adoption.

Father testified that he has taken various classes while in prison serving his latest sentence and his testimony shows that he is doing better in prison than he was out of prison; in light of his long history of criminal behavior, however, this is not clear and convincing evidence that he has made a lasting adjustment of his behavior. Due to his incarceration he has been unable to visit and has not spoken to the children since they were placed in DCS custody; he has been unable to build and maintain a relationship with the children.

The children had behavioral problems when they came into the foster parent's home, and one child was suffering from ADHD. After living in a stable home for one year and receiving weekly therapy their behavior has improved and the child with ADHD is receiving treatment. Viewed from the perspective of the children, the evidence clearly and convincingly shows that termination of Father's rights is in their best interest.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

RICHARD H. DINKINS, JUDGE